1
2
3
4                          UNITED STATES DISTRICT COURT
5                         NORTHERN DISTRICT OF CALIFORNIA
6
7     JOSE ARMANDO ESCOBAR-LOPEZ,              Case No.  20-cv-01781-JD
8                         Plaintiff,
                                               **ORDER RE MOTION TO DISMISS**
9             v.                               Re: Dkt. No. 23
10    CITY OF DALY CITY, et al.,
11                        Defendants.
12
13          Plaintiff Escobar-Lopez, a citizen of El Salvador, was arrested in Daly City by officers of

14    the Daly City Police Department (DCPD) on a federal immigration warrant.  He contends that the

15    officers lacked authority under federal and California state law to make the arrest, particularly in

16    light of two recently enacted California statutes aimed at limiting the use of state and local

17    resources for immigration enforcement -- the Values Act, Cal. Gov't Code § 7284 *et seq.*, and the

18    Transparent Review of Unjust Transfers and Holds (TRUTH) Act, *id.* § 7283 *et seq.*  In a 63-page

19    complaint, not counting the attachments, he alleges two federal counts under 42 U.S.C. § 1983

20    (Section 1983) on Fourth Amendment and due process grounds, and twelve California state law

21    counts.  Escobar-Lopez sued Daly City and the DCPD.  He did not name the individual officers as

22    defendants.  *See* Dkt. No. 1.

23          Daly City has moved to dismiss the complaint under Federal Rule of Civil Procedure

24    12(b)(6).  Dkt. No. 23.  At oral argument, the Court focused on the Section 1983 claims, which are

25    the basis of subject matter jurisdiction for the case, and whether the complaint plausibly alleged

26    municipal liability for the officer's actions.  *See* Dkt. No. 37 at 3-15 (hearing transcript).  It does

27    not, and so the federal claims are dismissed with leave to amend.  The Court declines to take up

28    the state claims until a federal claim is plausibly alleged.

United States District Court
Northern District of California

**BACKGROUND**

As alleged in the complaint, Escobar-Lopez arrived in the United States from El Salvador in June 2015 as an unaccompanied minor.  Dkt. No. 1 ¶ 40.  The Department of Homeland Security (DHS) began removal proceedings against him shortly after he arrived.  *Id.* ¶¶ 41-42.  Escobar-Lopez says he did not receive notice of the proceedings and was ordered removed from the United States "in absentia" by an immigration judge in September 2017.  *Id.* ¶¶ 42-43.  DHS issued a civil arrest warrant for him.  *Id.* ¶ 44.

In May 2019, DCPD Officer Hart stopped Escobar-Lopez while he was driving home with his fiancée and her brother from a baptism ceremony.  *Id.* ¶¶ 46-48.  Escobar-Lopez says that he did not "swerve the vehicle or disregard any traffic lights or signs," and that he did not have any outstanding tickets.  *Id.* ¶ 47.  Officer Hart asked Escobar-Lopez for his driver's license.  *Id.* ¶ 50.  Escobar-Lopez does not speak English, and his fiancée, "who speaks limited English," said that Escobar-Lopez did not have a driver's license, and offered her identification instead.  *Id.*  Officer Hart asked Escobar-Lopez about his immigration status, and Escobar-Lopez showed him an identification card issued to him in El Salvador.  *Id.* ¶ 52.  Officer Hart ran a records check and discovered the outstanding immigration warrant.  *Id.* ¶ 53.  While these events transpired, a second DCPD officer arrived on the scene.  *Id.* ¶ 56.

Officer Hart arrested Escobar-Lopez for the immigration warrant.  *Id.* ¶¶ 57, 59.  He called Immigrations and Customs Enforcement (ICE) and provided identifying information about Escobar-Lopez to an ICE agent.  *Id.* ¶¶ 62-64.  The agent issued a hold and transfer request.  *Id.* ¶ 64.

Escobar-Lopez was taken to the DCPD station and transferred to ICE custody.  *Id.* ¶¶ 65, 70-71.  ICE detained him for approximately three months in the Yuba County Jail facility in Marysville, California.  *Id.* ¶ 76.  Escobar-Lopez alleges a number of complaints about the conditions of his custody.  *See id.* ¶¶ 76-81.

ICE released Escobar-Lopez from custody in August 2019, in response to what he characterizes as "pressure" from "public outcry and media attention."  *Id.* ¶ 82.  The release was conditioned on several requirements, such as wearing an ankle location monitor and a degree of

United States District Court
Northern District of California

2

1    home confinement.  *See id.* ¶¶ 86, 89.  After the complaint was filed, the Third Circuit reversed a

2    decision by the Bureau of Immigration Appeals denying Escobar-Lopez's request to re-open the

3    removal proceedings, and remanded the case for further consideration.  *See* Dkt. No. 38.  His case

4    is pending in the immigration court.

5    Most of the claims in the complaint are based on California state law, especially the

6    California TRUTH and Values Acts.  *See, e.g.,* Dkt. No. 1 ¶¶ 17-26, 103-08.  These statutes went

7    into effect in 2017 and 2018, respectively, and put substantial restrictions on the involvement of

8    state and local agencies in enforcing the federal immigration laws or cooperating with ICE.  The

9    Values Act prohibits state and local law enforcement officers from "[i]nquiring into an

10   individual's immigration status" or "[d]etaining an individual" at the request of immigration

11   authorities.  Cal. Gov't Code § 7284.6(a)(1)(A)-(B).  It expressly states that officers may not make

12   or intentionally participate in "arrests based on civil immigration warrants."  Cal. Gov't Code §

13   7284.6(a)(1)(E).  Among other provisions, the TRUTH Act requires local law enforcement

14   agencies to provide a written consent form to detained individuals before an ICE interview, and a

15   copy of any request from ICE to hold or transfer him.  Cal. Gov't Code § 7283.1(a)-(b).  The

16   TRUTH Act also imposes public disclosure requirements for agencies that allow ICE access to

17   detainees.  *See* Cal Gov't Code § 7283.1(c)-(d).

18   The complaint also draws substantially on a written DCPD policy for "Immigration

19   Violations" that was in effect when Escobar-Lopez was arrested in 2019.  Dkt. No. 1 ¶¶ 27-37 &

20   Exh. A.  The policy is attached to the complaint and incorporated by reference, *see* Dkt. No. 1 ¶

21   27, and so the Court takes it into account here, along with the other incorporated exhibits.  *See*

22   *Jones v. Progressive Cas. Ins. Co.*, Case No. 16-cv-06941-JD, 2018 WL 4521919, at *2 (N.D.

23   Cal. Sept. 19, 2018).  In pertinent part, the policy stated that DCPD personnel "shall not normally

24   undertake immigration investigations or inquire into the citizenship or immigration status of

25   persons encountered during police contacts and/or operations," because the mission of law

26   enforcement is undermined "when members of the immigrant community and/or their families and

27   friends lose trust and confidence in their police department because of the perception that its

28   officers are engaged in the enforcement of federal immigration laws."  *Id.* at 2-3.  The policy also

United States District Court
Northern District of California

3

stated that the "immigration status of individuals alone is generally not a matter for police action," and that "the fact that an individual is suspected of being an undocumented alien shall not be the sole basis for contact, detention, or arrest." *Id.* at 1.  The policy declared that the DCPD "is not charged with enforcing immigration laws; that responsibility and function lies with the federal government." *Id.* at 2.  Nevertheless, the policy did not prohibit DCPD officers "from cooperating with federal immigration officials when requested." *Id.* at 3.  The policy contained a summary of the TRUTH Act, *see id.*, but did not mention the Values Act.  The complaint alleges that defendants amended the policy after the public response to Escobar-Lopez's detention.  *See* Dkt. No. 1 ¶¶ 5-6, 103-04.

Daly City moved under Rule 12(b)(6) to dismiss all of the claims in the complaint.  Dkt. No. 23.  Among other contentions, Daly City says that Officer Hart had authority under federal law to arrest Escobar-Lopez and turn him over to ICE, and that the Values and TRUTH Acts do not provide for a private right of action.  It also says that a federal Section 1983 claim was not adequately alleged.

**DISCUSSION**

**I.      LEGAL STANDARDS**

The standards governing a motion to dismiss under Rule 12(b)(6) are well-established.  *See McLellan v. Fitbit, Inc.*, No. 3:16-CV-00036-JD, 2018 WL 2688781, at *1 (N.D. Cal. June 5, 2018).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint make "a short and plain statement of the claim showing that the pleader is entitled to relief."  To meet that rule, and survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This calls for "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The plausibility analysis is "context-specific" and not only invites but "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## II.     THE SECTION 1983 CLAIMS

There is little doubt that the complaint raises potentially complex questions under California state law about Escobar-Lopez's arrest.  These questions entail some novel legal issues, such as whether the Values and TRUTH Acts permit a private lawsuit.  Neither side identified a California state court decision addressing this question, and it appears to be a matter of first impression.

But the Court need not dive into the state law waters at this time, because Escobar-Lopez has not plausibly alleged a Section 1983 claim, and consequently a federal question that establishes the Court's jurisdiction.  Local governments and their agencies are "persons" subject to liability under Section 1983, and may be liable only when an official policy or custom causes a constitutional tort.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 & n.54 (1978); *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 564 (9th Cir. 2001).  To state a claim under Section 1983 against municipal defendants, a plaintiff must allege: (1) that he or she was deprived of a constitutional right; "(2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation."  *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (internal quotation marks and citation omitted).  There must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

Under Section 1983, each defendant, whether a public entity or an individual person, is liable only for its "own misconduct."  *Iqbal*, 556 U.S. at 677; *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011).  Two corollaries follow from this principle.  First, a city may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior.  *See Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691.  Second, the fact that individual officers may have a defense to liability, such as qualified immunity, does not prevent the city or county from being held liable.  *See Fairley v. Luman*, 281 F.3d 913, 917 & n.4 (9th Cir. 2002).

United States District Court
Northern District of California

1    In addition, a policy or practice requires more than a few occurrences of challenged

2    conduct.  A single or even a few isolated and sporadic incidents of unconstitutional conduct are

3    not enough to impose municipal liability under Section 1983.  *See Gant v. Cnty. of Los Angeles*,

4    772 F.3d 608, 618 (9th Cir. 2014) (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24

5    (1985)).  Liability must be "founded upon practices of sufficient duration, frequency and

6    consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v.*

7    *Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

8        These propositions make relatively short work of Escobar-Lopez's Section 1983 claims.

9    He alleges two constitutional deprivations:  an unreasonable seizure under the Fourth Amendment

10   (claim one), and a "due process" violation under the Fourteenth Amendment with respect to

11   "liberty interests" created by the California Values Act (claim three).  Dkt. No. 1 at pp. 28, 36.

12   Both claims are based on the single incident of his arrest in 2019.  No other similar incidents are

13   mentioned, and there are no other allegations indicating that his arrest was the product of DCPD

14   practices "so persistent and widespread as to practically have the force of law."  *Connick*, 563 U.S.

15   at 61.  To the contrary, the complaint details comments by Daly City and the chief of police that

16   were critical of Escobar-Lopez's arrest and detention, and recounts several remedial measures

17   defendants implemented in response to the incident.  *See* Dkt. No. 1 ¶¶ 92-99.

18       The DCPD Immigration Violations policy incorporated in the complaint does not fill in the

19   missing factual allegations.  On its face, the policy advises officers not to engage in the

20   immigration-related conduct alleged against Officer Hart.  It may be that the policy did not

21   adequately advise officers of the provisions of the California Values Act, as Escobar-Lopez

22   contends, *see, e.g.*, Dkt. No. 1 ¶¶ 29-37, but that is of little moment for Section 1983 purposes.

23   "To the extent that the violation of a state law amounts to the deprivation of a state-created interest

24   that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress."

25   *Ove v. Gwinn,* 264 F.3d 817, 824 (9th Cir. 2001) (internal quotation omitted).

26       Overall, even taking all of the allegations in the complaint in Escobar-Lopez's favor, he

27   has not "nudged [his] claims . . . across the line from conceivable to plausible."  *Iqbal,* 566 U.S. at

28   680 (quoting *Twombly*, 550 U.S. at 560) (brackets in original).  On the face of the complaint, it is

6

equally conceivable that his arrest was a one-off occurrence by an DCPD officer acting on his volition as it was the product of a municipal practice or policy.  That will not do for pleading purposes.  *See id.* at 682 (citing *Twombly*, 550 U.S. at 567).  It may be true, as Escobar-Lopez argues, *see* Dkt. No. 27 at 6-7, that Officer Hart had no authority to arrest him under the federal immigration laws, and unlawfully prolonged a traffic stop to make the arrest, but the complaint does not tie that single incident to a pattern of conduct sufficiently robust to impose municipal liability.

Escobar-Lopez's effort to cast the Section 1983 claims as a failure to properly train the officers, *see* Dkt. No. 1 ¶¶ 123-24, 156-57, is unavailing for the same reasons.  A "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick*, 563 U.S. at 61.  To make out a Section 1983 claim, the failure to train must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Id.* (internal quotation omitted; brackets in original).  This is a "stringent standard," and as for other Section 1983 claims, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Id.* at 62 (quoting *Bryan Cty.*, 520 U.S. at 409).

Here too the absence of any allegations beyond the single incident with Escobar-Lopez vitiates a failure to train claim.  Escobar-Lopez tries to avert this conclusion by saying that alleging a pattern is not necessary when the risk of a constitutional violation from inadequate training is a "predictable" outcome.  Dkt. No. 27 at 9-10.  It is true that "in a narrow range of circumstances," a pattern of conduct may not be required because "the unconstitutional consequences of failing to train" are "so patently obvious that a city could be liable under § 1983" without such evidence.  *Connick*, 563 U.S. at 63-64 (internal quotation omitted).  But the complaint does not allege any facts demonstrating that it falls within this narrow exception.  All Escobar-Lopez says is that defendants lacked "a proper policy" with which to train DCPD officers.  Dkt. No. 27 at 10.  But as discussed, the DCPD Immigration Violations policy contained multiple statements advising officers against the type of actions that Officer Hart is said to have done.  The failure to detail the provisions of the Values Act in the policy hardly amounts to a

patently obvious risk of depriving a person of a federal constitutional right.  Nor does Escobar-Lopez allege any facts plausibly suggesting that the policy was "so facially deficient" that any "reasonable policymaker" would recognize it as an obvious risk.  *Hyun Ju Park v. City & Cty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020).

Consequently, Escobar-Lopez has not plausibly alleged a Section 1983 claim.  This is not to say that Officer Hart behaved impeccably under the law, as defendants suggest.  An argument can be made that arresting Escobar-Lopez was questionable under the Fourth Amendment because "it is not a crime for a removable alien to remain present in the United States," and local law enforcement officers cannot detain people or make arrests "based on nothing more than possible removability."  *Arizona v. United States*, 567 U.S. 387, 407 (2012); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012).  For this reason, the Supreme Court has held that local law enforcement normally may not make warrantless arrests on immigration grounds without prior federal authorization.  *Arizona*, 567 U.S. at 408-10.  This holding has been applied in another circuit to arrests by local police based on civil immigration warrants.  *See Santos v. Frederick Cnty. Bd. Of Comm'rs*, 725, F.3d 451, 457 (4th Cir. 2013).

A due process claim seems considerably less viable.  State law can create a liberty interest that forms the basis for a federal due process violation in only limited circumstances.  *See, e.g.*, *Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1155-56 (9th Cir. 2012); *James v. Rowlands*, 606 F.3d 646, 656-57 (9th Cir. 2010).  The state law must both provide procedural guarantees and protect some independent "substantive end" using "explicitly mandatory language."  *James*, 606 F.3d at 656 (quoting *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir.1995)).  In addition, a state law that provides additional procedural protections for a liberty interest already protected by the federal constitution cannot provide the basis for a due process claim under Section 1983.  *Id.* at 657.  Because Escobar-Lopez's freedom from unreasonable searches and seizures by the police is already protected by the Fourth Amendment, many potentially applicable provisions of the Values Act might be characterized as merely additional procedural protections for an existing federal right.  *Cf. Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002).

1    In any event, the Court does not decide these issues now.  They are reserved for future

2    proceedings as warranted by developments in the case.

3    **III.    THE STATE CLAIMS**

4    This case was filed on the basis of a federal question under Section 1983, which was the

5    sole ground asserted for subject matter jurisdiction.  *See* Dkt. No. 1 ¶ 12; 28 U.S.C. § 1331.  The

6    Court declines to take up the twelve state claims until a federal claim is plausibly alleged.  *See*

7    *Casillas v. MTC Fin., Inc.*, No. 15-CV-00085-JD, 2015 WL 2120565, at *3 (N.D. Cal. May 5,

8    2015).

9    **CONCLUSION**

10    The complaint is dismissed with leave to amend.  Escobar-Lopez may file an amended

11    complaint consistent with this order by April 13, 2021.  Failure to file an amended complaint by

12    that deadline, or a statement electing to stand on the current complaint, will result in dismissal

13    with prejudice under Rule 41(b).

14    **IT IS SO ORDERED.**

15    Dated:  March 23, 2021

16

17    _____

18    JAMES DONATO
United States District Judge

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California